**FILED**
**UNITED STATES DISTRICT COURT**
ALBUQUERQUE, NEW MEXICO

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

DEC **2 6** 2017

**MATTHEW J. DYKMAN**
CLERK

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 17MR 1162 |
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (505) 410-8548 (TARGET TELEPHONE) | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Please see Attachment A.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:
Pleas see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §841 §846 | Possession with intent to distribute a conrolled substance; Conspiracy |

The application is based on these facts:
Please see Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of _120_ days (give exact ending date if more than 30 days: _04/25/2018_ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Larry Pantoja, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____12/26/2017_____

_____
*Judge's signature*

City and state: Albuquerque, New Mexico

Chief United States Magistrate Judge Karen B. Molzen
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (505) 410-8548 (TARGET TELEPHONE) | Case No. _____<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Larry Pantoja, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned telephone number (505) 410-8548 ("TARGET TELEPHONE"), whose service provider is Sprint, a wireless telephone service provider headquartered in Overland Park, Kansas. The TARGET TELEPHONE is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been since October 2015.  As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for criminal offenses, to include those enumerated in 18 U.S.C. § 2516.  My experience as a Special Agent includes, but is not limited to, conducting surveillance, interviewing witnesses, writing affidavits for and executing search and seizure warrants, debriefing defendants and confidential sources and working with undercover agents and informants.  I have received training and have experience in the investigation of violations of

1

the federal drug and money laundering laws, including the offenses listed below. I have also participated in the investigation of numerous drug trafficking conspiracies As a result, I am familiar with matters including, but not limited to, the means and methods used by drug traffickers and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions. I also have experience in analyzing and interpreting drug codes and cryptic dialogues used by drug traffickers. I have spoken to other law enforcement officers with similar experience.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge or surrounding facts pertaining to this matter.

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846 have been committed, are being committed, and will be committed by Jesus M LOPEZ, Jr. ("LOPEZ"), Abel GALLEGOS ("GALLEGOS"), Zachary FOGLER aka BIRDMAN aka BIRD ("FOGLER") and their co-conspirators to facilitate their drug trafficking activities. The location of the TARGET TELEPHONE will assist investigators in confirming the identity of the user of TARGET TELEPHONE, and will assist in identifying LOPEZ'S, GALLEGOS', and FOGLER's co-conspirators, sources of supply, and stash house locations used by LOPEZ, GALLEGOS, and FOGLER. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

2

## PROBABLE CAUSE.

5.      This case involves the investigation of a drug trafficking organization that includes known and unknown individuals who are involved in both distributing controlled substances within the District of New Mexico and transporting controlled substances to the District of New Mexico from the United Mexican States. During the course of this investigation, agents have obtained evidence of the drug conspiracy through confidential source ("CS") statements, CS controlled purchases, undercover agent ("UC") purchases, surveillance, wiretap intercepts, and toll analysis.

6.      Since July 2017, agents have conducted nine UC purchases of cocaine and methamphetamine from GALLEGOS. Using these UC purchases, in conjunction with surveillance and toll analysis, agents identified LOPEZ as a crystal methamphetamine source of supply to GALLEGOS. Most recently, a UC purchased approximately one pound of crystal methamphetamine from GALLEGOS and LOPEZ on December 12, 2017.

7.      On December 8, 2017, the Honorable James A. Parker, Senior United States District Judge for the District of New Mexico, signed an order authorizing the interception of wire and electronic communications over two cellular phones used by GALLEGOS (GALLEGOS PHONE 1 and GALLEGOS PHONE 2) for a period of thirty days. Agents executed this order on December 11, 2017, thereby expiring on January 9, 2018.

8.      On December 12, 2017, law enforcement agents conducted a UC purchase from GALLEGOS. At approximately 12:42 p.m., agents established surveillance at a residence used by LOPEZ, a gray and green trailer located on the west side of Western Heights Mobile Village, 6600 Sage Road SW, Albuquerque, New Mexico.  At approximately 1:04 p.m., the UC contacted GALLEGOS at (505) 302-8389 (GALLEGOS PHONE 2), but was disconnected.  At

3

approximately 1:07 p.m., GALLGEGOS contacted the UC from GALLEGOS PHONE 2.  In this conversation, the UC requested to purchase one pound of crystal methamphetamine. GALLEGOS informed the UC that GALLEOGS had to call "him".

9.       At approximately 1:08 p.m., GALLEGOS placed a call from GALLEGOS PHONE 2 to (725) 221-5413 (LOPEZ PHONE), a phone investigators have identified as being used by LOPEZ.  GALLEGOS informed LOPEZ that the UC wished to purchase "one" (one pound of crystal methamphetamine). LOPEZ stated that he (LOPEZ) had them and to bring the UC to LOPEZ's father's house.

10.       At approximately 1:45 p.m., the UC met with GALLEGOS at a gas station and followed GALLEGOS to LOPEZ's father's trailer at Western Heights Mobile Village. Once at the trailer, the UC provided GALLEGOS $4,000.00 to purchase a pound of crystal methamphetamine from LOPEZ.  The UC remained outside the trailer and observed GALLEGOS meet with LOPEZ at the southern door of the trailer.  GALLEGOS then returned to the UC and handed the UC a package containing a clear crystal-like substance.  The UC verified the methamphetamine was present and then departed from the vicinity of the trailer park.  A few minutes later, GALLEGOS departed from the trailer park in a separate direction.

11.       The package received from GALLEGOS was weighed and tested at the DEA Albuquerque District Office on the same day.  The package yielded a weight of approximately 490.0 gross grams and yielded a presumptive positive for the presence of methamphetamine.

12.      On December 12, 2017, at approximately 10:02 p.m., agents intercepted an incoming phone call on GALLEGOS PHONE 2 from LOPEZ PHONE. The following is a transcription (in English) of the conversation which occurred in English and Spanish[1]:

|        |        |
|--------|--------|
| | [CALL ALREADY IN PROGRESS] |
| LOPEZ: | Eey.  Listen, dude.  I'm...I now... For a while, dude.  For like two (2), three (3) months, dude, I've been selling to a guy. |
| GALLEGOS: | Yes. |
| LOPEZ: | But he does get from me regularly, dude.  Like every two (2) days he gets one (1), and I give it to him at a good price.  But now I was talking to him, and then I said... He had told me that he has done time, dude, that he was at a half way house And then he... I asked him, "well where did you do your time?" And all that.  And he was telling me about it.  He told me that...that he ended up doing it in Hobbs, dude, and he told me that he had... That he even used to talk to you, that he knows Pooh and Jaime. |
| GALLEGOS: | Who is he? |
| | [VOICES OVERLAP] |
| LOPEZ: | He's from Albuquerque.  They call him Bird [PH]. |
| GALLEGOS: | Bird? |
| LOPEZ: | Yes. |
| GALLEGOS: | Bird. |
| LOPEZ: | Bird.  He knows Pooh, dude, and your brother, and then he know Jaime.  Says he was working with Jaime, that he's from |

[1] The DEA does not have the resources to staff all aspects of the investigation and the requested interceptions with Special Agents and deputized law enforcement officers.  As a result, monitoring personnel include civilian personnel, operating under a contract with the government and acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception. This conversation was monitored, translated, and transcribed by a civilian contractor.

Albuquerque.  And I told him, "then you know Po'... You know
Gato, or what?"  He said, "O'..."  Oh, no.  I asked him, "do you
know Gato's brother?"  No.  Gato's brother.  "You know Pooh's
brother."  And then he told me, "who?  Gato, or what?"  I told him,
"yes."  And then he told me, "yes."  And then he tells me, "well I
don't know him in person, but I used to talk to him over the phone
when I was locked up."  Supposedly he just got out in August,
dude.

[…]

LOPEZ:          The Bird.  Could he be Crazy Bird [U/I], no?  Or what?

GALLEGOS:       Oh, the Bird.

LOPEZ:          Yes.  The Bird.  Bird.  *"B", "I", "R", "D".*

GALLEGOS:       He's from Albuquerque.  Is he Mexican?

LOPEZ:          He said he's from Albuquerque, dude.  He looked white to me.  It
                also seemed to me that he was white.  He doesn't even look
                Chicano.  I just have... I saw him once, and he's a tall skinny guy.
                Just to know him...

                [VOICES OVERLAP]

GALLEGOS:       Oh.

LOPEZ:          ...to have him screened.  Let's see if he's not a rat, dude.

GALLEGOS:       All right.  Yes.  Yes.

                [VOICES OVERLAP]

LOPEZ:          I'...It's just that at moments you don't know what's up, but, well,
                he'd be a really...

                [VOICES OVERLAP]

GALLEGOS:       [COUGHS]

LOPEZ:          ...good *bro*, dude, because they buy like...one (1) every two (2)
                days, and I give it to him here for...

                [VOICES OVERLAP]

6

| | |
|---|---|
| GALLEGOS: | Yes. |
| LOPEZ: | ...thirty-eight (38). |
| GALLEGOS: | Just stay alert with them. [U/I] |
| | [VOICES OVERLAP] |
| LOPEZ: | Only he doesn't take it, dude.  He doesn't... |
| GALLEGOS: | ...take it.  The give it from [U/I] |
| LOPEZ: | Yes.  No.  Well that guy doesn't take it, dude.  A woman's taken it, dude. |
| GALLEGOS: | All right. |
| LOPEZ: | A woman's taken it.  Only they're really fussy, buddy.  If it's short half (½) a gram... Because of a fucking gram, ha'...half (½) a gram, he's calling me, "hey. It was short half (½) a gram. Eh, um, now its [U/I]" and then every time I take the guy one (1), well, I give a bit to him.  I give some to him.  Not a lot, dude.  I give him a half (½). |
| | [CONVERSATION CONTINUES] |

13.     Based on my training, experience, and knowledge of the investigation, I believe

LOPEZ contacted GALLEGOS to inform GALLEGOS of a customer that LOPEZ has been

supplying crystal methamphetamine to in the past two to three months. LOPEZ refers to this

person as "BIRD" and states that he (LOPEZ) supplies BIRD with "one" every two days.  I

believe this instance, much like the instance with the UC, when LOPEZ is discussing "one," he

is referring to one pound of crystal methamphetamine.  LOPEZ further states that he is selling it

(the crystal methamphetamine) to BIRD for "38" which I believe to be $3,800, which is similar

to the $4,000 the UC is paying for one pound of crystal methamphetamine from LOPEZ.

LOPEZ is discussing BIRD with GALLEGOS because LOPEZ is not sure if BIRD could

possibly be working on behalf of law enforcement and asks GALLEGOS to check into it because GALLEGOS knows people that BIRD also knows. LOPEZ goes on to state that BIRD served a prison sentence in Hobbs, New Mexico, was from Albuquerque, New Mexico, "looked white," and was a "tall skinny guy." Using this information, investigators conducted tolls analysis of LOPEZ's phone to see if any subscribers in contact with LOPEZ matched the description for BIRD that LOPEZ provided to GALLEGOS.

14.    Agents identified the TARGET TELEPHONE as being the third most frequent contact of LOPEZ PHONE, with 229 contacts occurring between LOPEZ PHONE and the TARGET TELEPHONE from December 2, 2017, and December 18, 2017. The TARGET TELEPHONE is subscribed to Bird Man, 2404 NE Sandler Dr., Albuquerque, NM 87112 (effective September 3, 2017) and was formerly subscribed to Bernard Taylor, 2404 Sandler, Albuquerque, NM 87112 (effective August 25, 2017). Through law enforcement databases, agents identified a Bernard Taylor, DOB 12/03/1967, as being associated with the 2404 Sandler address. Investigators then inquired with the New Mexico Corrections Department (NMCD) to see if Taylor had recently been incarcerated, but found that Taylor was last in the NMCD in 2011. However, NMCD provided information that Taylors's son, Zachary FOGLER, DOB 03/13/1986, had been released from Lea County Correctional Facility in Hobbs, New Mexico, on August 22, 2017. FOGLER was identified as being 5'10", 156 pounds, and a white male. NMCD further provided information that FOGLER's moniker was "Birdman" and was paroled to a halfway house upon his release. This information, combined with the intercepted phone call, leads me to believe FOGLER is using the TARGET TELEPHONE. I am seeking this order, in part, to fully identify the user of the TARGET TELEPHONE and confirm if FOGLER is the "BIRD" that LOPEZ describes to GALLEGOS.

8

15.    Based on the UC purchases, surveillance, and toll analysis, I believe probable cause exists to show that FOGLER is using the TARGET TELEPHONE, and that the TARGET TELEPHONE is being used to facilitate illegal drug transactions. Additionally, I believe the TARGET TELEPHONE will continue to be used to contact LOPEZ and other co-conspirators in relation to violations of 21 U.S.C. §§ 841 and 846.  Agents intend to use the requested cell phone location information to locate the TARGET TELEPHONE and positively identify the user of the TARGET TELEPHONE as FOGLER. Agents will also use the requested cell phone location information to monitor locations where FOGLER may travel to obtain illegal drugs, and thereafter identify locations FOGLER, LOPEZ, GALLEGOS, and their co-conspirators use in furtherance of their drug trafficking activities. Additionally, agents request to continue monitoring for the full duration of 45 days to continue monitoring FOGLER's drug trafficking activities in the District of New Mexico, as the newly intercepted conversation demonstrates FOGLER intends to continue distributing illegal drugs in the District of New Mexico.

16.    In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular

9

telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

17.     Based on my training and experience, I know that Sprint can collect E-911 Phase II data about the location of the TARGET TELEPHONE.

## AUTHORIZATION REQUEST

18.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

19.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize delay of notice of the acquisition of the Requested Location Information for a period not to exceed 120 days from the date that the order is entered. Agents intend to monitor the location of the TARGET TELEPHONE to identify co-conspirators, stash house locations, and foreign or domestic sources of supply. As this investigation is still at an infancy stage, agents request delayed notification to preserve the investigation and give agents sufficient time to develop the investigation. There is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the TARGET TELEPHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. Agents believe a delay of 120 days is foreseeably necessary based on the nature of this investigation. The period of delay may thereafter be extended by the court for good cause

shown.  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent the Requested Location Information constitutes wire and/or electronic communication (as defined in 18 U.S.C. § 2510) or stored wire or electronic information, there is reasonable necessity for its seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

20.     I further request that the Court direct Sprint to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Sprint.  I also request that the Court direct Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Sprint's services.  The government shall reasonably compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

21.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET TELEPHONE outside of daytime hours.

11



22.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Larry Pantoja
Special Agent
U.S. Drug Enforcement Administration

Subscribed and sworn to before me on this 26th day of December, 2017

HONORABLE KAREN B. MOLZEN
CHIEF UNITED STATES MAGISTRATE JUDGE

12

## ATTACHMENT A

### Property to Be Searched

1.     The cellular telephone assigned telephone number (505) 410-8548, with International

Mobile Subscriber Identity number 310120232881042 (TARGET TELEPHONE), whose

wireless service provider is Sprint, a wireless telephone service provider headquartered in

Overland Park, Kansas.

2.     Information about the location of the TARGET TELEPHONE that is within the

possession, custody, or control of Sprint, including information about the location of the

cellular telephone if it is subsequently assigned a different call number.

13



## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the TARGET TELEPHONE described in Attachment A for a period of forty-five days, during all times of day and night.  "Information about the location of TARGET TELEPHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government.  In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the Target Cell Phone on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

2